**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEVENTY SEVEN FINANCE INC., *et al.* | ) | Case No. 16-11409 (LSS) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Seventy Seven Finance Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") file this motion (the "Motion") for entry of interim and final orders:  (i) authorizing the Debtors to (a) obtain postpetition financing and (b) use cash collateral; (ii) granting adequate protection; (iii) modifying the automatic stay; (iv) scheduling a final hearing; and (v) granting related relief.  In support of this Motion, the Debtors rely upon (i) the *Declaration of Cary Baetz in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and (ii) the *Declaration of Andrew Yearley in Support of the Debtors' Motion to Approve DIP Financing* (the "Yearley Declaration"), each of which is

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Seventy Seven Energy Inc. (8422); Seventy Seven Finance Inc. (3836); Seventy Seven Operating LLC (8399); Great Plains Oilfield Rental, L.L.C. (4318); Seventy Seven Land Company LLC (4346); Nomac Drilling, L.L.C. (9548); Performance Technologies, L.L.C. (5813); PTL Prop Solutions, L.L.C. (2147); SSE Leasing LLC (5764); Keystone Rock & Excavation, L.L.C. (8771); Western Wisconsin Sand Company, LLC (4510).  The Debtors' mailing address is 777 NW 63rd Street, Oklahoma City, Oklahoma 73116.

filed contemporaneous herewith and incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

JURISDICTION

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2 and 9013-1(m) of the Local Rules.

<u>**RELIEF REQUESTED**</u>

4.      By this Motion, the Debtors request entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "<u>Interim Order</u>")[2] and a final order upon notice and following a final hearing (the "<u>Final Order</u>," together with the Interim Order, the "<u>DIP Orders</u>"):

a.      authorizing the Debtors to obtain postpetition financing on a superpriority basis pursuant to the terms and conditions of the DIP Orders and that certain Senior Secured Debtor-In-Possession Credit Agreement, substantially in the form attached to the proposed Interim Order as **Exhibit 1** (the "<u>DIP Facility</u>" or the "<u>DIP Credit Agreement</u>"; the loans thereunder, the "<u>DIP Loans</u>"), by and among each of Debtors, as borrowers or guarantors (collectively, the "<u>DIP Loan Parties</u>"), Wells Fargo Bank, National Association ("<u>Wells Fargo</u>"), as administrative agent, collateral agent and sole lead arranger and book runner (in such capacities, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (collectively, the "<u>DIP Lenders</u>") providing for, *inter alia*, revolving loans and letters of credit in the total aggregate principal amount of up to $100,000,000;

b.      authorizing the Debtors to execute, deliver, and perform under the DIP Loan Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

c.      authorizing the Debtors to incur and pay all DIP Obligations, including the interest and fees described herein, pursuant to the terms and conditions of the DIP Loan Documents;

d.      authorizing the Debtors to pay and satisfy in full all amounts owed by the Debtors on account of outstanding letters of credit[3] and other obligations of the Debtors under that certain Credit Agreement, dated as of June 25, 2014 (as amended from time to time, and as further described below, the <u>Pre-Petition Revolving Credit Agreement</u>" or the "<u>Pre-Petition Revolving Facility</u>," and the lenders and agent thereto, respectively the "<u>Pre-Petition Revolving Lenders</u>" and the "<u>Pre-Petition Revolving Agent</u>"), subject to the terms of the Interim Order;

e.      authorizing the Debtors to enter into and to approve the form of the Pre-Petition Revolving Loan Termination Agreement, dated June 7, 2016 attached hereto as **Exhibit 3** (the "<u>Pre-Petition Revolving Loan Termination Agreement</u>");

---

[2] Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Loan Documents and the DIP Orders, as applicable.

[3] Letters of credit outstanding under the Pre-Petition Revolving Facility will roll into letters of credit under the DIP Credit Agreement, on an interim basis, and roll into the exit facility on the Effective Date of the Plan.  As of the Petition Date, the Debtors had outstanding letters of credit under the Pre-Petition Revolving Facility in the amount of approximately $15.0 million.  There are no other outstanding borrowings under the Pre-Petition Revolving Facility that the Debtors seek to repay from the proceeds of the proposed DIP financing.

f.    granting to the DIP Agent and DIP Lenders valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral, including, without limitation, all Cash Collateral to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth in the Interim Order and other DIP Documents;

g.    authorizing the Debtors to grant to the DIP Agent and DIP Lenders allowed superpriority administrative expense claims in respect of all DIP Obligations, as set forth in the Interim Order;

h.    authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral pursuant to the Budget, the Interim Order and the DIP Loan Documents;

i.    approval of certain stipulations by the Debtors relating to pre-petition loan agreements, security interests, liens and other obligations;

j.    providing adequate protection to the Pre-Petition Revolving Agent, the Pre-Petition Revolving Lenders, the Term Agent, the Term Lenders, the Incremental Term Loan Agent and Incremental Term Loan Lenders (as each such term is defined below) for any diminution of value of their respective interests in pre-petition collateral, including Cash Collateral;

k.    vacating and modifying the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents, and providing for the immediate effectiveness of the DIP Orders; and

l.    scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing.

## PURPOSE AND SUMMARY OF THE PROPOSED DIP FACILITY

5.    Current market conditions have created substantial uncertainty in the Debtors' industry.  Weak oil and gas prices have created challenges for the Debtors and their counterparties.  When coupled with an anticipated restructuring through bankruptcy, the Debtors believed that it was critically important to demonstrate their strength through availability of liquidity in order to maintain the confidence of their vendors, customers and counterparties.  The Debtors have substantial cash on their balance sheet in addition to the availability under the proposed DIP Facility, which, taken together, should provide the confidence necessary to allow

the Debtors to continue operations in the ordinary course notwithstanding the chapter 11 cases. The proposed DIP Facility also provides continuity from the pre-petition loan facility through the chapter 11 cases to the proposed exit facility.

6.    The Debtors submit this statement listing certain material terms set forth in the DIP Facility and the Interim Order consistent with the applicable Local Rules.  Specifically, the significant terms of the DIP Loan Documents to be executed and to which the DIP Facility refers are as follows:[4]

| | |
|---|---|
| *Borrowers:* | Nomac Drilling, L.L.C., Performance Technologies, L.L.C. and Great Plains Oilfield Rental, L.L.C. (individually, a "Borrower" and collectively, "Borrowers"),each as a debtor and debtor-in possession under chapter 11 (the "Chapter 11 Cases") of the U.S. Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware ( "Bankruptcy Court"). |
| *Guarantors:* | Seventy Seven Energy Inc., Seventy Seven Operating LLC, Mid-States Oilfield Supply LLC, Seventy Seven Land Company LLC, PTL Prop Solutions, L.L.C., and SSE Leasing LLC (individually a "Guarantor" and collectively, "Guarantors", each as a debtor and debtor-in possession under the Chapter 11 Cases. The Borrowers and the Guarantors are referred to herein each individually, as a "Loan Party" and collectively, "Loan Parties"). |
| *Sole Lead Arranger and Bookrunner:* | Wells Fargo will act as sole lead arranger and bookrunner under the DIP Facility (in such capacity, "DIP Arranger"). |
| *Administrative and Collateral Agent:* | Wells Fargo will act as the administrative agent and the collateral agent under the DIP Facility (in such capacities, "DIP Agent"). |
| *Lenders:* | Wells Fargo and such other institutions as to which the DIP Agent and the Debtors agree that may become parties to the DIP Facility as lenders (collectively, "DIP Lenders"). |
| *Swing Line Lender:* | Wells Fargo (in such capacity "Swing Line Lender"). |
| *Letter of Credit Issuer:* | Wells Fargo (in such capacity, the "Issuing Bank"). |
| *Credit Facility:* | The DIP Facility will consist of a post-petition senior secured revolving loan and letter of credit facility provided to Borrowers of up to *$100,000,000* (the "Maximum Credit").  The revolving loans under the DIP Facility ("Revolving |

[4] This is intended as a summary for purposes of Federal Rule of Bankruptcy Procedure 4001(c) only and does not reference all of the terms, conditions, representations, warranties, covenants and other provisions which will be contained in the definitive documentation for the DIP Credit Agreement and the transactions contemplated thereby. It is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the DIP documentation.

| | |
|---|---|
| | <u>Loans</u>") will be subject to the Borrowing Base (as defined below) and other terms described below.  Borrowers will appoint Debtor Seventy Seven Operating LLC ("<u>OpCo</u>") to act as the agent for Loan Parties for all purposes of dealing with DIP Agent, Issuing Bank, Swing Line Lender, and DIP Lenders, including requesting Revolving Loans and LCs. |
| ***Letter of Credit Facility:*** | A portion of the DIP Facility will be available for commercial letters of credit and standby letters of credit arranged by DIP Agent and issued by the Issuing Bank ("<u>LCs</u>") for the account of the Loan Parties in an aggregate amount not to exceed $25 million of the Maximum Credit at any time outstanding.  The aggregate amount of outstanding LCs for the account of a Loan Party will be reserved against the Borrowing Base.   Each DIP Lender under the DIP Facility will purchase an irrevocable and unconditional participation in each LC. LCs outstanding under the Pre-Petition Revolving Facility on the Closing Date and issued by a DIP Lender shall be rolled into the DIP Facility on the Closing Date. |
| ***Swing Line Facility:*** | A portion of the DIP Facility will be available as swing line loans on same day notice ("<u>Swing Line Loans</u>") with a sublimit in the amount of $10 million.   The term "Revolving Loans" as used herein includes Swing Line Loans, except as otherwise provided herein. Swing Line Loans will be made available by the Swing Line Lender and each Lender will purchase an irrevocable and unconditional participation in each Swing Line Loan. |
| ***Borrowing Base:*** | The Revolving Loans and LCs shall be provided to Borrowers subject to the lesser of the Maximum Credit or the Borrowing Base and otherwise subject to the terms and conditions of the DIP Loan Documents. |
| ***Interest and Fees:*** | *Interest Rate Option*—Borrowers may elect that Revolving Loans bear (other than Swing Line Loans) interest at a rate per annum equal to (a) the Base Rate plus the Revolving Loan Applicable Margin (as such term is defined in Schedule 2) or (b) LIBOR plus the Revolving Loan Applicable Margin.  Swing Line Loans will bear interest at a rate per annum equal to the Base Rate plus the Revolving Loan Applicable Margin. |
| | *Unused Line Fee*—Borrowers shall pay to DIP Agent, for the account of DIP Lenders, an unused line fee calculated at 0.75% per annum until the last day of the first full month after closing and adjusted thereafter every month to an amount equal to 0.75% per annum multiplied by the difference between the Maximum Credit and the average outstanding Revolving Loans and LCs during the immediately preceding month, payable monthly in arrears.  Swing Line Loans will not be considered in the calculation of the Unused Line Fee. |
| | *LC Fees*—Borrowers shall pay to DIP Agent, for the account of DIP Lenders, on the daily undrawn balance of LCs, a letter of credit fee which shall accrue at a per annum rate equal to the Letter of Credit Usage Applicable Margin (as such term is defined in Schedule 2) times the daily undrawn amount of all outstanding LCs, payable monthly in arrears.  In addition, Borrowers shall pay issuance, arranging and other fees of the Issuing Bank substantially as provided in the Pre-Petition Revolving Credit Agreement. |
| | *Appraisal Fees*—Borrowers shall be required to pay (a) a fee of $1,000 per day, per examiner, plus reasonable and documented out-of-pocket expenses for each field |

|  | examination of the Loan Parties performed by personnel, employed by DIP Agent and (b) the actual fees or charges paid or incurred by DIP Agent (but in no event less than a charge of $1,000 per day, per person) plus reasonable and documented out-of-pocket expenses, if it elects to employ the services of one or more third persons to perform field examinations or to appraise the Collateral or any portion thereof or establish electronic collateral reporting, subject to the limitations set forth in the DIP Credit Agreement.<br><br>*DIP Facility Fee*—Borrowers shall pay to DIP Agent a DIP Facility Fee in an amount of $350,000, for its own account and for the account of other DIP Lenders in accordance with the agreements among them (as applicable), which facility fee is fully earned on the date hereof and will be due and payable in full in cash upon the Closing Date.<br><br>*Expense Reimbursement and Indemnity*—As provided at section 10.3 of the DIP Credit Agreement. |
|---|---|
| **Collateral and Priority:** | To secure all obligations of each Loan Party under the DIP Facility, the Loan Parties will grant first priority (subject to certain permitted liens) perfected security interests in and liens upon all of each Loan Party's present and future assets and properties consisting of the following: (x) all assets and property pledged as "Collateral" under the Pre-Petition Revolving Credit Agreement, (y) all proceeds of present and future claims, rights, interests, assets and properties recovered by or on behalf of each Loan Party or any trustee of a Loan Party (whether in the Chapter 11 Cases or any subsequent case to which any Chapter 11 Case is converted), including without, limitation, all proceeds of actions maintained or taken pursuant to, inter alia, Sections 542, 545, 548, 549, 550, 552 and 553 of the Bankruptcy Code (upon entry of the Final Order as defined below), and (z) assets and properties not subject to valid, perfected and non-avoidable liens as of the Petition Date defined below (collectively, the "<u>DIP Collateral</u>"). The DIP Collateral includes such assets of Loan Parties existing on the date of the filing by the Loan Parties of their petitions to commence the Chapter 11 Cases (the "<u>Petition Date</u>") and such assets of the Loan Parties arising or acquired after the Petition Date.<br><br>All amounts owing by the Loan Parties under the DIP Facility at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than the Carve-Out (the "<u>DIP Superpriority Claim</u>").<br><br>Notwithstanding anything to the contrary contained herein, the DIP Collateral shall not include the Excluded Property.<br><br>Interim Order § 2.1; DIP Facility, Schedule 1, "Collateral" |
| **Carve Out:** | "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Debtors or any official committee appointed by the Bankruptcy Court (such committee, a |

|  | "Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 1103 of the Bankruptcy Code, subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery by the  DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, in an amount not to exceed  $500,000 to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and (B) after the delivery of a Carve-Out Trigger Notice in an aggregate amount not to exceed $3,000,000, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (B) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Borrowers, their lead restructuring counsel, counsel to any Committee, if any, and the U.S Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. Nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds.<br><br>Interim Order § 2.3; DIP Facility, Schedule 1, "Carve-Out" |
| *Adequate Protection:* | Until the payment and satisfaction in full and discharge of the Pre-Petition Revolving Credit Facility (which shall in no event be deemed to have occurred until the expiration of the challenge period provided in the Final Order), provided that no adversary proceeding or contested matter has been timely and properly asserted with respect to the Pre-Petition Revolving Credit Facility or against the Pre-Petition Revolving Agent or the Pre-Petition Revolving Lenders (in their capacities as such), the Pre-Petition Revolving Lenders will be authorized to receive as adequate protection: (a) current cash payment of professionals' reasonable and documented fees and expenses and other disbursements whether incurred before or after the Petition Date (which shall be limited to the reasonable and documented fees, expenses and disbursements of one legal counsel, one local counsel and one financial advisor for the Pre-Petition Revolving Agent and the Pre-Petition Revolving Lenders as a group); (b) replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facility (in the same relative priority as the Pre-Petition Revolving Facility); and (c) superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims.<br><br>As adequate protection and in exchange for their consent of the Debtors' continuing use of their respective collateral, the Term Agent, Term Lenders, the Incremental Term Loan Agent and Incremental Term Loan Lenders will be granted: (i) replacement liens to the extent of any diminution in value in their respective interest in their collateral (subject to the Carve-Out, Permitted Liens and Claims, the DIP Liens and the adequate protection liens granted to the Pre-Petition Revolving Lenders), (ii) a super-priority administrative claim under section 507(b) of the Bankruptcy Code that is junior to the superpriority claims granted to the DIP Lenders and Pre-Petition Revolving Lenders, (iii) authorization for the Debtors to pay professional fees and expenses of such parties in accordance with the DIP Budget, (iv) authorization for the Debtors to make principal and interest payments due under the Term Agreements in accordance with the Budget and (v) deposit |

<table>
<tr><td></td><td>proceeds of any sale of Term Collateral in a bank account subject to a deposit control agreement in favor of Term Lenders and Incremental Term Lenders.

Interim Order § 2.5.</td></tr>
<tr><td>*Use of Proceeds:*</td><td>The proceeds of the Revolving Loans and LC's will be used for working capital of Borrowers and the other Loan Parties and other general corporate purposes in accordance with the Budget (as defined below) (subject to permitted variances), including to refinance in full on the Closing Date the Obligations outstanding under the Pre-Petition Revolving Credit Agreement.  No portion of the administrative expenses or priority claims in the Chapter 11 Case, other than those directly attributable to the operation of the business of Borrowers or to which DIP Agent has specifically agreed, shall be funded with the Revolving Loans or LCs and the percentages and categories of permitted allocations of such claims and expenses shall be in accordance with the Budget as approved by DIP Agent. Notwithstanding the foregoing, proceeds shall not be used by any Loan Party to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Pre-Petition Revolving Agent's, Pre-Petition Revolving Lenders', DIP Agent's and DIP Lenders' pre-petition and/or post-petition liens, claims and rights.

DIP Facility §  6.11</td></tr>
<tr><td>*Closing Date:*</td><td>The date on which all of the conditions precedent to the initial Revolving Loans and LCs under the DIP Facility are satisfied or waived (the "Closing Date").</td></tr>
<tr><td>*Milestones / Maturity Date:*</td><td>The DIP Facility shall be for a term ending on the earliest of (the earliest of such dates being referred to as the "Maturity Date"):

(a) nine (9) months from the date of the Petition Date;

(b) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to by DIP Agent in writing);

(c)(i) the occurrence of the Exit Facility Conversion Date (as defined below) or (ii) the effective date of a plan of reorganization filed in the Chapter 11 Cases pursuant to an order entered by the Bankruptcy Court, each of which shall be in form and substance acceptable to DIP Agent (the "Approved Plan of Reorganization"); provided, that, if the occurrence of the Exit Facility Conversion Date does not occur, such Approved Plan of Reorganization and the order confirming such plan are acceptable the DIP Agent (which shall provide for the indefeasible payment in full of all obligations owing to DIP Agent and DIP Lenders); and

(d) the acceleration of the loans or termination of the commitments under the DIP Facility.

"Exit Facility Conversion Date" means any date on which the Approved Plan of Reorganization becomes effective, if the Loan Parties have elected to enter into a senior secured exit asset-based revolving credit facility with DIP Agent and DIP Lenders in connection with the Approved Plan of Reorganization (the "Exit</td></tr>
</table>

| | |
|---|---|
| | Revolving Credit Facility") and the Exit Revolving Credit Facility shall have become effective in accordance with its terms.<br><br>On the Exit Facility Conversion Date, all loans and other obligations outstanding under the DIP Facility shall be converted to loans under the Exit Revolving Credit Facility, subject to terms and conditions to be agreed upon by the Loan Parties, DIP Agent and DIP Lenders. |
| ***Collateral and Financial Reporting:*** | (a)  monthly borrowing base certificates, so long as (i) Excess Availability is greater than 20.0% of the Maximum Credit, (ii) Revolving Loans (net of LCs) are outstanding at any time in the amount of less than $20,000,000, and (iii) no Event of Default exists or has occurred and is continuing, otherwise weekly (and in such event the delivery of borrowing base certificates on a weekly basis shall continue for not less than four (4) consecutive weeks);<br><br>(b)  field examinations as DIP Agent may from time to time require, but no more than: (i) one (1) field examinations during the term of the DIP Credit Agreement, or (2) DIP Agent shall have the right to conduct an additional field examination in any 12 consecutive month period if either (x) the term of the DIP Credit Agreement is not extended, or (y) there are Revolving Loans (net of LCs) outstanding at any time in the amount of $20,000,000 or more, (ii) such other field examinations as DIP Agent may request at any time upon the occurrence and during the continuance of an Event of Default at the expense of Borrowers or at any time at the expense of DIP Agent;<br><br>(c)  monthly financial statements and annual audited financial statements and projections, including the operating reports prepared by the Loan Parties in compliance with the US Trustees' Operating Guidelines and Reporting Requirements; and<br><br>(d)  13-week cash flow forecast, setting forth projected sources and uses of Borrowers' funding and projected availability under the Borrowing Base, on a rolling 13-week basis, updated weekly (the "Budget"), together with  a variance analysis showing actual sources, uses and availability compared to projected sources, uses and availability for such period, which variance report shall be delivered weekly,<br><br>"Excess Availability" means (i) the lesser of the Borrowing Base or the Maximum Credit, minus (ii) the outstanding principal amount of Revolving Loans and amounts available to be drawn under LCs under the DIP Facility.<br><br>DIP Facility §§ 2.9, 5.2 |
| ***Events of Default:*** | Substantially as provided in the Pre-Petition Revolving Credit Agreement with such additional Events of Default to include as follows::<br><br>(a)  dismissal of the Chapter 11 Cases or conversion to Chapter 7;<br><br>(b)  termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;<br><br>(c)  appointment of a chapter 11 trustee or examiner with expanded powers; |

<table>
<tr>
<td></td>
<td>(d) failure to obtain a Final Order within thirty (30) days immediately following the date of entry of the Interim Order approving the use of cash collateral and the DIP Facility;

(e) entry of an order granting any super-priority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief);

(f) entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full of the DIP Facility as of the effective date of the plan;

(g) payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Agent and the Bankruptcy Court or as otherwise contemplated by the DIP Loan Documents);

(h) cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

(i) the failure of Borrowers or Guarantors to comply with any DIP Order; or

(j) any DIP Order is revoked, remanded, vacated, reversed, stayed, rescinded, modified, or amended on appeal.

Upon the occurrence and during the continuance of an Event of Default, at the election of DIP Agent the automatic stay of Section 362 of the Bankruptcy Code shall be terminated for the limited purpose of permitting the DIP Agent, on behalf of DIP Lenders to do any of the following: (w) foreclose on the DIP Collateral; (x) enforce all of their guaranty rights; and/or (y) declare the principal of and accrued interest, fees and expenses constituting the obligations under the DIP Facility to be due and payable, provided that the DIP Agent must provide five business days' written notice prior to taking any action to proceed against or realize upon the Collateral.

Interim Order § 3.1–3.2; DIP Facility § 8</td>
</tr>
<tr>
<td>**Waivers:**</td>
<td>Waiver of any right that any Borrower or Guarantor may have to seek authority (i) to use cash collateral of Pre-Petition Revolving Agent, Pre-Petition Revolving Lenders, DIP Agent and DIP Lenders under Section 363 of the Bankruptcy Code (other than as permitted under the DIP Orders), (ii) to obtain post-petition loans or other financial accommodations, other than from DIP Agent and DIP Lenders, pursuant to Sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of DIP Agent, (iii) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of DIP Agent's pre-petition and post-petition liens and claims, (iv) to challenge the application of any payments or collections received by DIP Agent or DIP Lenders to the obligations of any Loan Party as provided for herein, (v) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all obligations arising under the DIP Facility on the Effective Date of such plan if the Exit Facility Conversion Date does not occur, (vi) to surcharge the DIP Collateral</td>
</tr>
</table>

| | pursuant to Section 506(c) of the Bankruptcy Code, or (vii) to seek relief under the Bankruptcy Code, including without limitation, under Section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of DIP Agent or any DIP Lender as provided herein, the DIP Loan Documents or the DIP Orders.  The Interim Order and the Final Order shall also provide for releases by the Loan Parties in favor of the DIP Agent and DIP Lenders of all claims relating to the Pre-Petition Revolving Credit Facility, and an agreement to provide DIP Agent and DIP Lenders a release upon the repayment in full of all obligations under the DIP Facility.<br><br>Interim Order §§ 4.2; DIP Facility § 10.1 |
|---|---|

## LOCAL RULE 4001-2 DISCLOSURES

7.    The Debtors submit that the following financing terms are required to be identified pursuant to Local Rule 4001-2.  As discussed herein, such terms are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

a.    **Stipulations to Validity, Perfection, and Amount of Pre-Petition Liens; Waiver of Pre-Petition Claims**.  Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.  The DIP Loan Documents include certain stipulations by the Debtors related to the validity, amount, and perfection of the liens and claims of (i) the Pre-Petition Revolving Agent and the Pre-Petition Revolving Lenders, (ii) the Term Agent and Term Lenders, and (iii) the Incremental Term Loan Agent and Incremental Term Loan Lenders.  The proposed Interim Order provides for the challenge period for such stipulations to be the earliest of (a) sixty calendar days from the date of appointment of the Committee by the U.S. Trustee, (b) in the event no Committee is appointed within the thirty days following the Petition Date, by any party in interest with requisite standing within seventy-five calendar days from the date of entry of this Interim Order or (c) the date that is seven business days prior to the date that the Court schedules the confirmation hearing take place with respect to Debtors' Joint Pre-Packaged Plan of Reorganization (collectively, the "Challenge Period").  *See* Interim Order § E, 4.1.

b.    **Waiver of Section 506(c) Surcharge**.  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the Pre-Petition Revolving Agent, Pre-Petition Revolving Lenders, the Term Agent, the Term Lenders, the Incremental Term Loan Agent and the Incremental Term Loan Lenders effective only upon entry of the Final Order granting such relief.  *See* Interim Order § 4.3.

12

c.      **Liens on Avoidance Actions**.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  The DIP Agent and the DIP Lenders, are not granted liens on Avoidance Actions, but they will receive liens on the proceeds of Avoidance Actions upon entry of the Final Order.  *See* Interim Order § 2.1. The Pre-Petition Revolving Agent, the Pre-Petition Revolving Lenders, the Term Agent, the Term Lenders, the Incremental Term Agent and the Incremental Term Lenders are also granted adequate protection liens on Avoidance Action Proceeds.  *See* Interim Order § 2.5.

d.      **Exchange of Prepetition Revolving Obligations**. Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans from a party to repay its own prepetition debt.  The DIP Loan Documents provide for the satisfaction of indebtedness of the Debtors on account of approximately $15.0 million of issued letters of credit through a dollar-for-dollar exchange for LCs to be issued under the DIP Facility.  *See* Interim Order ¶ 1.4.

e.      **Priming Liens**.  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder.  The DIP Liens will prime the existing liens of the Pre-Petition Revolving Agent and Pre-Petition Revolving Lenders.  *See* Interim Order § 2.1.  As discussed more fully herein, those parties have consented to the DIP Liens priming their existing liens.

f.      **Equities of the Case**.  Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code.  Effective upon entry of the Final Order, the Pre-Petition Revolving Agents and Pre-Petition Revolving Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties or the Prepetition Revolving Obligations.  *See* Interim Order § 5.7.

8.      The provisions of the DIP Loan Documents as to which disclosure was required pursuant to Local Rule 4001-2 are justified under the circumstances of the Chapter 11 Cases. These financing terms are an integral part of a comprehensive restructuring, including exit financing, and have been agreed to at the requisite consent thresholds by those stakeholders whose interest is implicated.  The DIP Lenders would not agree to the DIP Facility and the Pre-Petition Revolving Lenders would not agree to the use of Cash Collateral or the priming of their liens without the inclusion of such terms.

<u>BACKGROUND</u>

**I.      Introduction and Case Background**

9.      On June 7, 2016 (the "<u>Petition Date</u>"), the Debtors commenced these cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.

10.      The Debtors remain in possession of their property and are operating their business as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been requested or appointed in these chapter 11 cases.

11.      On the Petition Date, the Debtors filed the *Joint Prepackaged Chapter 11 Plan of Reorganization of Seventy Seven Finance Inc. and Its Affiliated Debtors* (the "<u>Plan</u>") and the related Solicitation and Disclosure Statement, dated May 9, 2016 (the "<u>Disclosure Statement</u>").

12.      A detailed description of the Debtors' business, capital structure, and the events leading to these chapter 11 cases is fully set forth in the First Day Declaration and is incorporated herein by reference.

**II.      The Debtors' Material Pre-Petition Secured Indebtedness**

*Pre-Petition Revolving Facility*

13.      In connection with the spin-off transactions with Chesapeake Energy Corporation ("<u>Chesapeake</u>"), in June of 2014 Seventy Seven Operating LLC ("<u>OpCo</u>") entered into the Pre-Petition Revolving Credit Agreement, a five-year senior secured revolving bank credit facility with total commitments of $275.0 million.  The maximum amount that the company may borrow under the Pre-Petition Revolving Facility is subject to a calculated borrowing base, which is based on a percentage of eligible accounts receivable, subject to certain reserves and other adjustments.

14.     As of April 21, 2016, the Pre-Petition Revolving Facility had availability of $55.1 million, net of issued letters of credit, the amount of which as of the Petition Date was $15,003,729.  The Debtors are obligated to reimburse the Pre-Petition Revolving Lenders to the extent any such issued letters of credit are drawn upon.   Other than on account of the $15,003,729 of issued letters of credit, as of the Petition Date there are no other outstanding borrowings by the Debtors under the Pre-Petition Revolving Facility.

15.     Borrowings[5] under the Pre-Petition Revolving Facility are secured by liens on cash and accounts receivable of the Debtors, subject to certain permitted liens under section 6.2 of the Pre-Petition Revolving Credit Agreement.  Additionally, the Debtors' obligations under the Pre-Petition Revolving Facility are guaranteed jointly and severally by HoldCo and all of OpCo's direct and indirect material domestic subsidiaries.  The Pre-Petition Revolving Facility requires maintenance of a fixed charge coverage ratio based on the ratio of consolidated EBITDA (minus unfinanced capital expenditures) to fixed charges at any time availability is below a certain threshold and for a certain period of time thereafter.  Finally, the Pre-Petition Revolving Facility also contains cross-default provisions that apply to other indebtedness of the Debtors.

*The Term Loan Credit Agreement*

16.     Subsequent to the spin transactions with Chesapeake, OpCo entered into that certain Term Loan Agreement, dated as of June 25, 2014 (as amended, modified or

---

[5] Borrowings under the Pre-Petition Revolving Facility bear interest at the Debtors' option at either (i) a base rate, calculated as the greatest of (1) the rate of interest publicly announced by Wells Fargo as its "prime rate," subject to each increase or decrease in such prime rate effective as of the date such change occurs, (2) the federal funds effective rate plus 0.50% and (3) the one-month LIBOR rate plus 1.00%, each of which is subject to an applicable margin or (ii) LIBOR, plus, in each case, an applicable margin.  The applicable margin ranges from 0.50% to 1.00% per annum for base rate loans and 1.50% to 2.00% per annum for LIBOR loans.  The unused portion of the Pre-Petition Revolving Facility is subject to a commitment fee that varies from 0.250% to 0.375% per annum, according to average unused amounts.  Interest on LIBOR loans is payable at the end of the selected interest period, but no less frequently than quarterly.  Interest on base rate loans is payable monthly in arrears.

supplemented from time to time, the "Term Loan Credit Agreement"), a $400 million seven-year term loan agreement. Wilmington Trust, N.A. (the "Term Agent"), as successor in interest to Bank of America, N.A. is the administrative and collateral agent under the Term Loan Credit Agreement for the lender parties thereto (the "Term Lenders"). The company's obligations under the Term Loan Credit Agreement are repayable in equal consecutive quarterly installments equal to 0.25% (1.00% per annum) of the original principal amount of the Term Loan and mature in full on June 25, 2021.[6]

17. As of the Petition Date, the Debtors were obligated to the Term Agent and Term Lenders under the Term Loan Credit Agreement and related security documents in respect of loans and other related obligations in an aggregate principal amount of approximately $393,000,000, plus accrued and unpaid interest, as well as certain costs, fees, expenses and other charges.

18. Obligations under the Term Loan Credit Agreement are guaranteed jointly and severally by Debtors HoldCo, Great Plains, Nomac, PTL, PTL Prop, SSE Leasing and LandCo. Amounts borrowed under the Term Loan Credit Agreement are secured by senior liens on all of the equity interests in OpCo's subsidiaries and all of the subsidiaries' present and future real property, equipment (including drilling rigs and equipment used in hydraulic fracturing), fixtures and other fixed assets (together with all other "Collateral" as defined in the Term Loan Credit Agreement and related loan and security documents, the "Term Loan Liens").

---

[6] Borrowings under the Term Loan Credit Agreement bear interest at the Debtors' option at either (i) a base rate, calculated as the greater of (1) the Bank of America, N.A. prime rate, (2) the federal funds rate plus 0.50% and (3) a one-month LIBOR rate adjusted daily plus 1.00% or (ii) LIBOR, with a floor of 0.75%, plus, in each case, an applicable margin. The applicable margin for borrowings is 2.00% for base rate loans and 3.00% for LIBOR loans, depending on whether the base rate or LIBOR is used, provided that if and for so long as the leverage ratio is less than a certain level and the term loans have certain ratings from each of S&P and Moody's, such margins will be reduced by 0.25%.

19.     The collateral securing the Debtors' obligations in respect of the Term Loan Credit Agreement is not within the scope of the DIP Collateral, such that the DIP Facility will not prime the liens and security interests of the Term Agent and Term Lenders.

*The Incremental Term Loan*

20.     On May 13, 2015, the Debtors entered into an incremental term supplement to the Term Loan Credit Agreement (the "Incremental Term Loan Agreement") with Wilmington Trust, N.A. (the "Incremental Term Loan Agent"), in its capacity as the administrative and collateral agent, as successor in interest to Bank of America, N.A., and the lenders party thereto (the "Incremental Term Loan Lenders").  The Incremental Term Loans are payable in equal consecutive quarterly installments equal to 0.25% (1.00% annualized) of the original aggregate principal amount of the Incremental Term Loans, and mature in full on June 25, 2021.[7]

21.     As of the Petition Date, the Debtors were obligated to the Incremental Term Loan Agent and Incremental Term Loan Lenders under the Incremental Term Loan Agreement and related security documents in respect of loans and other related obligations in an aggregate principal amount of approximately $99,000,000, plus accrued and unpaid interest, as well as certain costs, fees, expenses and other charges.

22.     Obligations under the Incremental Term Loan Agreement are guaranteed jointly and severally by Debtors HoldCo, Great Plains, Nomac, PTL, PTL Prop, SSE Leasing and LandCo.  Amounts borrowed under the Term Loan Credit Agreement are secured by liens on all of the equity interests in OpCo's subsidiaries and all of the subsidiaries' present and future real property, equipment (including drilling rigs and equipment used in hydraulic fracturing), fixtures

---

[7] Borrowings under the Incremental Term Loan Agreement bear interest at OpCo's option at either (i) LIBOR, with a floor of 1.00% or (ii) a base rate, calculated as the greatest of (1) the Bank of America, N.A. prime rate, (2) the federal funds rate plus 0.50% and (3) a one-month LIBOR rate adjusted daily plus 1.00%, plus, in each case, an applicable margin.  The applicable margin for borrowings is 9.00% for LIBOR loans and 8.00% for base rate loans, depending on whether the base rate or LIBOR is used.

and other fixed assets (together with all other "Collateral" as defined in the Incremental Term Loan Agreement and related loan and security documents, the "Incremental Term Loan Liens"). The Incremental Term Loan Liens are junior in right and priority to the Term Loan Liens.

## III.    Events Giving Rise to the Need to Restructure and Seek DIP Financing

*The Downturn in the Energy Industry*

23.    As the Court is aware, the energy industry has been burdened broadly by a dramatic decline in the price of oil and gas.  With commodity prices already relatively low due to the substantial increase in supply in North America over the past decade (due largely to hydraulic fracturing technology), oil prices began a steep descent beginning in mid-2014. Aggravating the decline, in November 2014 the Organization of Petroleum Exporting Countries—after years of tempering significant fluctuations in oil prices through the control of supply—announced that it would not reduce production quotas in the face of the significant decrease in the price of oil.  By the end of the third quarter of 2015, the price of oil had decreased by more than 50% year over year—from approximately $92 a barrel as of September 15, 2014, to below $50 a barrel as of September 15, 2015.  On January 12, 2016, oil fell below $30 a barrel for the first time in 12 years.  While prices have recovered since the low mark earlier this year, they remain more than 50% below  the 2014 highs.

24.    These market conditions continue to affect oil and gas companies at every level of the industry.  Even the largest multinational integrated oil and gas companies have been substantially affected by the current market conditions.  Current equity and debt trading prices in the sector reflect the scale of the current financial distress.

*Impact on the Debtors' Business*

25.    Like other companies in the drilling and oilfield services market, the Debtors have faced challenges as demand for their services and equipment has substantially weakened.  The

performance of the Debtors' business is indirectly tied to the price of oil and gas. All three of the Debtors' business lines—drilling rigs, hydraulic fracturing services and oil-field rentals—have suffered substantial declines in revenue and earnings as result of the collapse in commodity prices. On a consolidated basis, the Debtors had total revenues of $155.4 million for the first quarter of 2016, compared to total revenues of $429.8 million for the first quarter of 2015, a year-over-year decrease of 64%. Total revenues for the 2015 full year were $1.131 billion, compared to total revenues of $2.081 billion for the 2014 full year, a year-over-year decrease of 46%.

**IV.    Negotiation of the Restructuring Support Agreement and DIP Facility**

26.    Largely driven by the fluctuation in commodity prices, Seventy Seven, like other companies in the drilling and oilfield services markets, has faced challenges as demand for oilfield services remains weak. In early 2016, faced with a heavy debt burden, declining revenues and an uncertain near-term outlook in its industries, Seventy Seven hired financial and legal advisors to evaluate a wide range of possible options to improve Seventy Seven's financial position in the event of a prolonged market downturn. As part of its consideration of several possible alternatives, Seventy Seven began separate, contemporaneous negotiations with groups of holders of Seventy Seven's Term Loans, Incremental Term Loans, OpCo Notes and HoldCo Notes—which groups would ultimately make up the Restructuring Support Parties—regarding a potential restructuring transaction that would allow Seventy Seven to substantially reduce its debt burden, maintain certain of its existing financing sources and enhance its liquidity in order to help Seventy Seven navigate the current down cycle.

27.    On May 12, 2016, after many weeks of intensive negotiations, the Debtors entered into the Second Amended Restructuring Support Agreement (as may be amended from time to time, the "Restructuring Support Agreement") with (i) lenders under the Term Loan

Credit Agreement party to the Restructuring Support Agreement (the "Consenting Term Lenders"), who hold collectively hold approximately 86% of the Term Loan Claims, (ii) lenders under the Incremental Term Supplement party to the Restructuring Support Agreement (the "Consenting Incremental Term Lenders"), who hold collectively hold 100% of the Incremental Term Loan Claims, (iii) an ad hoc group of holders of the OpCo Notes party to the Restructuring Support Agreement (the "Consenting OpCo Noteholders"), who hold collectively hold approximately 63% of the OpCo Notes and (iv) an ad hoc group of holders of HoldCo Notes party to the Restructuring Support Agreement (the "Consenting HoldCo Noteholders" and together with the Consenting Term Lenders, the Consenting Incremental Term Lenders and the Consenting OpCo Noteholders, the "Restructuring Support Parties"), who hold collectively hold in excess of 50% of the HoldCo Notes.  The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, the Restructuring Support Parties in connection with a restructuring of the Debtors' OpCo Notes and HoldCo Notes, as well as certain modifications to the Term Loans under the Term Loan Credit Agreement (as amended by the Term Loan Credit Agreement Amendment) and the Incremental Term Loans, which are to be implemented through the Plan.

28.    The restructuring transactions contemplated by the Plan will significantly deleverage the Debtors' balance sheet, eliminating all of the Debtors' outstanding unsecured bond obligations by converting $1.1 billion in aggregate principal amount of the OpCo Notes and HoldCo Notes into 100% of the New HoldCo Common Shares.  Significantly, although they are out of the money on an absolute priority rule basis and therefore not entitled to a distribution under the Plan, the Plan provides that holders of Existing HoldCo Interests will receive warrants to purchase up to an aggregate of 20% of the equity in the Reorganized HoldCo at predetermined

equity values.  Importantly, holders of Allowed General Unsecured Claims will be paid in the ordinary course of business in accordance with ordinary course terms under the Plan subject to any rights or defenses the Debtors may have to all or any portion of such Claims.  As such, the Plan will reinstate those General Unsecured Claims and leave them unimpaired.  The Debtors have also received the benefit of continued borrowing, subject to certain modifications and conditions, under the Term Loans and Incremental Term Loans and a commitment from their DIP Lenders—who are also lenders under the Debtors' Prepetition ABL Facility—to provide a $100 million asset-based exit facility to provide liquidity for the continuation of operations following the Effective Date.

29.    The DIP Facility, in some respects, is a bridge between the Debtors' prepetition revolving credit agreement and the exit financing contemplated by the Restructuring Support Agreement.  The DIP will provide liquidity, fund the administration of these cases, and provide additional certainty to all stakeholders, including those classes of creditors that are impaired under the Plan.  A more detailed description of the negotiation and process leading up to the Debtors' decision to enter into the DIP Facility is set forth in the *Yearley Declaration*, which is also incorporated herein by reference

### BASIS FOR THE RELIEF REQUESTED

30.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or

both.  Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. §§ 364(c), (d).

31.     As set forth above and in the First Day Declaration and Yearley Declaration, the Debtors believe that the DIP Facility is the best financing available under the circumstances and will enable the Debtors to pursue a necessary deleveraging of their balance sheet.  This restructuring is in the best interests of all stakeholders because it (i) achieves a substantial deleveraging of the Debtors through consensus with a significant portion of the Debtors' debt holders, (ii) provides for a reduction of approximately $65 million of the Debtors' pre-restructuring annual interest burden on previously funded debt, (iii) provides $100 million of new financing and (iv) eliminates potential deterioration of value—and disruptions to operations—that could otherwise result from protracted and contentious bankruptcy cases.

32.     The Debtors submit that they have satisfied the requirements to obtain postpetition financing on a superpriority, secured basis pursuant to sections 364(c) and (d) of the Bankruptcy Code.  Importantly, the Pre-Petition Revolving Lenders have consented to the priming of their liens by the DIP Liens and usage of Cash Collateral.  Moreover, the proposed grant of liens on the DIP Collateral does not extend to the collateral encumbered by the Term Loan Liens or the Incremental Term Loan Liens, such that the Term Loan Liens and Incremental Term Loan Liens will not be primed.

33.     As further discussed herein, the DIP Facility will be secured by substantially all of those assets of the Debtors' estates constituting (i) collateral securing the Debtors' obligations under the Pre-Petition Revolving Credit Agreement, (ii) all proceeds of claims and causes of

action, including those arising under chapter 5 of the Bankruptcy Code, and (iii) assets and properties not subject to valid, perfected and non-avoidable liens as of the Petition Date. Such security includes super-priority claims, security interests, and secured liens pursuant to section 364. The circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

## I.  The Debtors Should Be Authorized to Obtain Post-Petition Financing Under Section 364(c) of the Bankruptcy Code

34.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already-encumbered assets. 11 U.S.C. § 364(c). Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–29 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

35.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.      The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b.      The credit transaction is necessary to preserve the assets of the estate; and

      c.      The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Ames Dep't Stores*, 115 B.R. at 37–39.

36.      The Debtors propose to obtain the financing set forth in the DIP Loan Agreement by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)–(3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

### A.      The Debtors Could Not Obtain Unsecured Financing.

37.      To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the

geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

38.     As set forth in the Yearley Declaration, unsecured post-petition financing was simply not available to the Debtors under the circumstances of their pre-petition capital structure, existing indebtedness, and the state of their industry.  This is unsurprising given, among other things, the substantial level of secured debt the Debtors have incurred and the others factors leading to the commencement of these cases.  *See* First Day Declaration at 15-22.  Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**B.      Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is in the Best Interests of Creditors.**

39.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest"). To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

40.     The Debtors' decision to enter into the proposed DIP Facility is an exercise of their sound judgment that warrants approval by the Court.  Without the proposed DIP financing, the Debtors cannot execute their restructuring and may not have adequate liquidity to fund their go-forward operations on the terms and conditions available to them before the Chapter 11 Cases.  The Debtors' management, board, and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing as part of this process.  Neither of those alternative yielded result that would allow the Debtors to continue to operate outside of chapter 11 and achieve a comprehensive deleveraging.  As a result, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility in connection with the Restructuring Support Agreement.  The DIP Facility will provide immediate access to capital to demonstrate to the industry that, despite weak market conditions, the Debtors have liquidity to pay their ongoing operating expenses and the expenses of the Chapter 11 Cases while preserving value and allowing the Debtors to effectuate the pre-packaged restructuring on terms that, collectively, are the best and most favorable terms.

41.     Without the DIP Facility, the Debtors' restructuring cannot be consummated on the terms and timeline contemplated by the Restructuring Support Agreement and Plan.  Indeed, the Requisite Consenting Creditor Parties (as such term is defined in the Restructuring Support Agreement) may terminate the Restructuring Support Agreement if the DIP Facility is not approved on an interim basis within two business days of the Petition Date or not approved on a final basis by June 30, 2016.  Termination of the Restructuring Support Agreement is not in the interest of the Debtors' creditors, particularly their unsecured creditors. Rather, the DIP Facility will allow the Debtors to pursue confirmation and implementation of their pre-packaged Plan,

satisfy their current and ongoing operating expenses—including postpetition wages and salaries, taxes, vendor payables, and their obligations under service agreements and other revenue-generating contracts.

**C.    The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.**

42.    In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886–89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364–65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

43.    First, the DIP Facility, along with the coupled consent to use cash collateral, will provide the Debtors with sufficient liquidity to continue their operations in the near term while they substantially reduce their funded indebtedness and debt service obligations through the Plan.  Second, the financial terms of the DIP Facility, including the $350,000 fee paid as consideration for the DIP Lenders' commitments regarding the DIP Facility, are consistent with market rate terms for such financing in this economic environment and the Debtors' industry. There is, in fact, no proposal with materially superior economic terms.  Finally, the non-economic terms of the DIP Facility—notably the budget, covenants, consensual priming, and ability to roll over the DIP Obligations into exit-financing at emergence—make the DIP Facility superior to any other facility with comparable terms.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

44.     Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out for certain administrative and professional fees.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate is adequately assisted by counsel and other professionals.  *See In re Ames*, 115 B.R. at 38.

45.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases, and the Debtors could not obtain post-petition financing from any other lending source.

**D.      The Satisfaction of the Pre-Petition Revolving Obligations is Necessary and Appropriate**

46.     The terms of the DIP Facility contemplate and provide for the refinancing of the Pre-Petition Revolving Obligations.  This roll-up is part of the overall restructuring negotiated by Debtors and the Restructuring Support Parties (as defined in the Restructuring Support Agreement).  The Debtors do not believe that the DIP Lenders would have agreed to the DIP Facility absent the satisfaction of the Pre-Petition Revolving Obligations.  While there were no amounts drawn and outstanding, the DIP Lenders had posted letters of credit pre-petition under the Prepetition Revolving Facility.

47.     Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured.  As the United States District Court for the District of Delaware recently observed:

> "[P]repetition secured claims can be paid off through a "roll-up."
> Most simply, a [roll up] is the payment of a pre-petition debt with
> the proceeds of a post-petition loan. Roll-ups most commonly arise
> where a pre-petition secured creditor is also providing a post-
> petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code. The proceeds of the DIP loan are used to pay off
> or replace the pre-petition debt, resulting in a post-petition debt
> equal to the pre-petition debt plus any new money being lent to the
> debtor. As a result, the entirety of the prepetition and post-petition
> debt enjoys the post-petition protection of section 364(c) and/or (d)
> as well as the terms of the DIP order. In both a refinancing and a
> rollup, the pre-petition secured claim is paid through the issuance
> of new debt rather than from unencumbered cash."

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 167 (D. Del. 2015) (quoting *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)); s*ee also, e.g., In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

48.    The Debtors submit that the satisfaction of the Pre-Petition Revolving Obligations and their entry into the Pre-Petition Revolving Loan Termination Agreement are appropriate and reasonable in these cases in light of several factors.  First, repayment of the Pre-Petition Revolving Obligations will not prejudice the Debtors' estates, because such payments are subject to the rights of parties in interest under Section 4.1 of the Interim Order to challenge or contest the validity, amount, perfection or enforcement of such obligations.  If such a challenge is successful, the Court may grant appropriate relief.  Second, the nature of the amounts being satisfied are unique, in that they are outstanding, undrawn letters of credit.  These letters of credit

are needed to continue relationships with certain contractual counterparties and their being preserved under the DIP Facility aids the uninterrupted continuation of the Debtors' business. Third, the amount of pre-petition obligations to be "rolled up" (approximately $14.1 million) in proportion to the total amount of DIP financing ($100 million)—approximately 15%—is well under the percentage of obligations rolled up in other financings approved by this and other courts. *See, e.g., In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. March 2, 2016) (50% roll-up); *In re Foamex Int'l Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Feb. 20, 2009) (66% roll-up approved in interim order); *In re Velo Holdings, Inc.*, Case No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012) (50% roll-up); *In re United Retail Grp., Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012) (28.8% roll-up); *In re Blockbuster Inc.*, Case No. 10-14997 (BRL); (Bankr. S.D.N.Y. Oct. 27, 2010) (50% roll-up); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (38.7% roll-up approved in interim order); *In re Lyondell Chem. Co.,* Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (59.4% roll-up).  The DIP Facility will provide at least $85 million of true new availability, and was negotiated simultaneously with the negotiation of the Debtors' go-forward exit revolving facility, also in the amount of $100 million and with substantially the same lenders.  Third, the proposed refinancing is in further of a chapter 11 plan that has already been accepted by each class of impaired creditors.

49.    Finally, under the DIP Facility, the borrowers, guarantors, as well as the scope of proposed collateral relative to the Debtors' total assets and other secured indebtedness, are the same as under the Pre-Petition Revolving Facility, reinforcing the separateness of the estates and minimizing the potential implications of the roll-up on pre-petition priority and recoveries.  The

Debtors submit that circumstances warrant the repayment of the Pre-Petition Revolving Obligations, and that doing so is supported by their sound business judgment.

      **E.**      **The DIP Lenders Are Extending Credit in Good Faith**

50.      Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

51.      As set forth in the First Day Declaration and the Yearley Declaration, the Debtors and the DIP Agent negotiated the DIP Credit Agreement and Interim Order at arm's length and good faith.  Accordingly, the DIP Orders should provide that the DIP Agent and DIP Lenders are entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

**II.**      **The Consensual Priming Liens and Granting of Adequate Protection to the Pre-Petition Revolving Lenders Should Be Approved**

52.      If a debtor is unable to obtain credit under the provisions of section 364(c) alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

      a.      The trustee is unable to obtain credit otherwise; and

      b.      There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*Id.*

53.     To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  However, consent by a secured creditor to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

54.     As demonstrated above, the Debtors believe that the DIP Facility is the only source of postpetition financing contemplated by the Plan.  In accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Pre-Petition Revolving Agent and Pre-Petition Revolving Lenders with adequate protection as described in the summary term sheet above.  In addition, the Pre-Petition Revolving Agent and Pre-Petition Revolving Lenders have affirmatively consented to the priming of their liens, which otherwise obviates the need to show adequate protection.  *Id.*

**III.    The Court Should Grant the Adequate Protection Provided in the DIP Orders in Favor of Term Lenders and Incremental Term Loan Lenders**

55.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code in turn states that adequate protection may be provided by:

> "(1) requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

56.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

57.    The Debtors are not seeking to prime the Term Loan Liens or the Incremental Term Loan Liens.  Nevertheless, in exchange for their consent to the Debtors' continual use of their respective collateral throughout the pendency of these cases, as adequate protection, the Term Agent, Term Lenders, the Incremental Term Loan Agent and Incremental Term Loan Lenders will be granted: (i) replacement liens to the extent of any diminution in value in their

33

respective interest in their collateral (subject to the Carve-Out, Permitted Liens and Claims, the DIP Liens and the adequate protection liens granted to the Pre-Petition Revolving Lenders), (ii) a super-priority administrative claim under section 507(b) of the Bankruptcy Code that is junior to the superpriority claim granted to the DIP Lenders and Pre-Petition Revolving Lenders, and (iii) authorization for the Debtors to pay reasonable, documented professional fees and expenses of such parties in accordance with the DIP Budget.   The Debtors submit that such provisions constitute sufficient adequate protection under the facts of these cases and for purposes of section 361 of the Bankruptcy Code.

## IV.    **Authority to Use Cash Collateral**

58.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).   Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> a.    Each entity that has an interest in such collateral consents; or
>
> b.    The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

59.    During the ordinary course of operations, the Debtors generate cash from the use of the DIP Collateral.  As of the Petition Date, the Debtors held only a *de minimis* amount of unrestricted cash.  The Debtors need the proposed DIP Facility and the use of Cash Collateral in order to fund their ordinary course of business operations and administer the Chapter 11 Cases while they pursue prompt confirmation of a chapter 11 plan as contemplated by the Restructuring Support Agreement.  As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion.  Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

60.    The Debtors submit that, under these circumstances, their request to use Cash Collateral should be approved.  The only parties with a material interest in the prepetition Cash Collateral—namely the Pre-Petition Revolving Lenders—consent to the use of Cash Collateral provided that the relief requested herein is granted.  Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to continue operations and could substantially impair the value of their assets as they attempt to deleverage their balance sheet during the Chapter 11 Cases.  On the other hand, allowing the Debtors to use Cash Collateral and, by extension, sustain their business operations will permit the Debtors to implement a restructuring strategy that will preserve and maintain value and yield the highest recovery for their estates and their creditors.  Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

## V.    Interim Approval Should Be Granted

61.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

62.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### FINAL HEARING

63.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (i) counsel to DIP Agent; (ii) counsel to the Pre-Petition Revolving Agent, (iii) counsel to the Term Agent, (iv) counsel to the Incremental Term Loan Agent, (v) the office of the United States Trustee (the "U.S. Trustee"), (vi) counsel to the Consenting Term Lenders (as defined below); (vii) counsel to the Consenting Incremental Term Lenders (as defined below); (viii) counsel to the Consenting OpCo Noteholders (as defined below), (ix) counsel to the Consenting HoldCo Noteholders (as defined below), (x) the holders of the thirty (30) largest unsecured claims, on a consolidated basis, against the Debtors' estates (the "30 Largest Unsecured Creditors"), (xi) the Internal Revenue Service, (xii) the Securities and Exchange Commission, (xi) the office of the attorneys general

for the states in which the Debtors operate and (xi) certain other parties identified in the certificate of service filed with the Court, including, without limitation, (a) all creditors who have filed or recorded pre-petition liens or security interests against any of the Debtors' assets, (b) all relevant state taxing authorities, and (c) all landlord, owners and/or operators of premises at which any of the Debtor Loan Parties' inventory and/or equipment is located (collectively, the "Noticed Parties"). The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

## **NOTICE**

64.    Notice of this Motion will be provided to the Notice Parties.

**WHEREFORE**, the Debtors respectfully request that the Court enter (i) the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

*[Signature Page Follows]*

Dated:   June 7, 2016                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
         Wilmington, Delaware

                                               */s/ Andrew R. Remming*_____
                                               Robert J. Dehney (No. 3578)
                                               Andrew R. Remming (No. 5120)
                                               1201 N. Market St., 16th Flr.
                                               PO Box 1347
                                               Wilmington, DE  19899-1347
                                               Telephone: (302) 658-9200
                                               Facsimile: (302) 658-3989
                                               rdehney@mnat.com
                                               aremming@mnat.com

                                               - and -

                                               BAKER BOTTS LLP
                                               Emanuel C. Grillo (*pro hac vice* pending)
                                               Christopher Newcomb (*pro hac vice* pending)
                                               30 Rockefeller Plaza
                                               New York, New York 10112
                                               Telephone: (212) 892-4000
                                               emanuel.grillo@bakerbotts.com
                                               chris.newcomb@bakerbotts.com

                                               *Proposed Counsel for Debtors*
                                               *and Debtors in Possession*