IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
:
In re:                                                     :   Chapter 11
:
SEVENTY SEVEN FINANCE INC., *et al.*,[1]                   :   Case No. 16-11409 (LSS)
:
Debtors.                                                   :   (Joint Administration Requested)
:
---------------------------------------------------------- X   Re: D.I. 12

**DECLARATION OF ANDREW YEARLEY**
**IN SUPPORT OF THE DEBTORS' MOTION TO APPROVE DIP FINANCING**

I, Andrew Yearley, declare as follows under penalty of perjury:

    1.    I am a Managing Director of Lazard Frères & Co. LLC ("Lazard"), the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm with is principal office located at 30 Rockefeller Plaza, New York, New York. I have been one of the principal personnel working on Lazard's engagement as the proposed investment banker of the above-captioned debtors and debtors in possession (collectively, the "Debtors") since December 2015. I understand the Debtors will file an application to employ Lazard as their investment banker in these chapter 11 cases.

    2.    Since Lazard's engagement, Lazard has rendered investment banking services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations and improving their overall financial condition. Additionally, Lazard has worked closely with the Debtors' management and other professionals retained by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Seventy Seven Energy Inc. (8422); Seventy Seven Finance Inc. (3836); Seventy Seven Operating LLC (8399); Great Plains Oilfield Rental, L.L.C. (4318); Seventy Seven Land Company LLC (4346); Nomac Drilling, L.L.C. (9548); Performance Technologies, L.L.C. (5813); PTL Prop Solutions, L.L.C. (2147); SSE Leasing LLC (5764); Keystone Rock & Excavation, L.L.C. (8771); Western Wisconsin Sand Company, LLC (4510). The Debtors' mailing address is 777 NW 63rd Street, Oklahoma City, Oklahoma 73116.

1

Active 25809299.1

the Debtors for these chapter 11 cases and has become acquainted with the Debtors' capital structure, liquidity needs and business operations.

3. I have been employed at Lazard since July 1999 where I have provided advice regarding restructurings, reorganizations, workouts and a variety of other transactions, including refinancing and distressed mergers and acquisitions. I currently am a Managing Director in Lazard's New York Restructuring practice, a member of the firm's North American Investment Banking Committee and a member of Lazard's Fairness Opinion Committee. Prior to joining Lazard, I was a Vice President in Deutsche Banc Alex. Brown's Restructuring Group and spent five years in the Restructuring and Reorganization Group at Ernst & Young LLP as a senior consultant, manager, and senior manager. I began my career in 1989 at the Chase Manhattan Bank in the Structured Finance Division, and spent two years as an Assistant Vice President in the Leveraged Transactions Group at BZW, the investment-banking arm of Barclays PLC. I graduated with a B.A. in Political Science from Duke University magna cum laude in 1989 and received an M.B.A. from Columbia University with honors in 1999.

4. I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 12] (the "DIP Motion").[2] Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations

---

[2] Capitalized terms used but not defined here have the meaning given in the DIP Motion or the *Declaration of Cary Baetz in Support of the Debtors First Day Motions* (the "First Day Declaration"), as applicable.

and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management and other members of the Lazard team, my review of relevant documents, or my opinion based upon experience. If I were called upon to testify, I could testify to the facts set forth in this Declaration.

### The Debtors' Exploration of Strategic Alternatives

5. Largely driven by the fluctuation in commodity prices, the Debtors, like other companies in the drilling and oilfield services markets, have faced challenges as demand for oilfield services remains weak. In December 2015, faced with a heavy debt burden, declining revenues and an uncertain near-term outlook in its industries, the Debtors engaged Lazard and legal advisors to evaluate a wide range of potential options to improve their financial position in the event of a prolonged market downturn. As part of its consideration of several possible alternatives, the Debtors began separate, contemporaneous negotiations with groups of holders of their Term Loans, Incremental Term Loans, OpCo Notes and HoldCo Notes regarding a potential restructuring transaction that would allow the Debtors to substantially reduce their debt burden, maintain certain of their existing financing sources and enhance their liquidity in order to help the Debtors navigate the current down cycle.

6. On May 12, 2016, after many weeks of intensive negotiations, the Debtors and the Restructuring Support Parties, who include (i) lenders under the Term Loan Credit Agreement that collectively hold approximately 86% of the Term Loan Claims, (ii) lenders under the Incremental Term Supplement that collectively hold 100% of the Incremental Term Loan Claims, (iii) an ad hoc group of holders of the OpCo Notes that collectively hold approximately 63% of the OpCo Notes and (iv) an ad hoc group of HoldCo Notes that collectively hold in excess of 50% of the HoldCo Notes, entered into the Second Amended Restructuring Support

3

Agreement (as may be amended from time to time, the "Restructuring Support Agreement"). The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, the Restructuring Support Parties in connection with a restructuring of the Debtors' OpCo Notes and HoldCo Notes, as well as certain modifications to the Term Loans under the Term Loan Credit Agreement (as amended by the Term Loan Credit Agreement Amendment) and the Incremental Term Loans, which are to be implemented through a prepackaged plan of reorganization (the "Plan").

7. In connection with the restructuring contemplated by the Restructuring Support Agreement, the Debtors seek approval of their entry into a senior, secured asset-based credit facility with a maximum availability of $100 million (the "DIP Facility").

**The Debtors' Need for Financing**

8. The Debtors need to obtain access to additional financing (including cash collateral) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational needs, including to address potential adverse impact on their business and operations relating to the filing of these cases. The Debtors' access to sufficient working capital and liquidity through the DIP Facility and the use of cash collateral is important to the preservation and maintenance of the going concern values of the Debtors, to their ability to sustain market confidence in the business and to complete the reorganization of the Debtors, as contemplated by the parties to the Restructuring Support Agreement. As discussed in the DIP Motion, the DIP Lenders have committed to provide financing that could be used by the Debtors to operate their business as debtors in possession.

9. The Debtors, in consultation with Lazard and their other advisors, determined that absent access to cash collateral and the DIP Facility they would not have adequate liquidity for the period necessary to effectuate a reorganization in accordance with the terms of the Restructuring Support Agreement. In addition, the Debtors believe that the availability of credit is important to the Debtors' ability to assure their customers, vendors and employees that they have adequate liquidity. Moreover, the DIP Facility is an integral component of the Restructuring Support Agreement, which provides a framework for the Debtors expedited emergence from chapter 11.

10. In light of the foregoing and based upon meetings with the Debtors' management team, I understand that the Debtors require access to cash collateral and the DIP Facility to fund the costs and expenses of administering these chapter 11 cases and continue as a going concern. The proposed DIP Facility and the use of cash collateral will help provide the Debtors with sufficient liquidity to meet management's forecasts of their ongoing day-to-day obligations, operational restructuring costs and the administrative costs of these chapter 11 cases (including payments required under the Restructuring Support Agreement), and working capital requirements and other operational expenses, all of which should help to preserve the value of the Debtors' estates.

### Negotiation of the DIP Facility

11. While in discussions with respect to the Restructuring Support Agreement, the Debtors, with the help of Lazard and their legal counsel, engaged with Wells Fargo Bank, National Association ("Wells Fargo" or the "DIP Agent"), the agent for the Debtors' existing Pre-Petition Revolving Credit Facility. The discussions between the parties proceeded over several weeks and ultimately led to execution by Wells Fargo and the Debtors of the

Active 25809299.1

*$100,000,000 Senior Secured Asset-Based DIP and $100,000,000 Exit Revolving Loan Facility Commitment Letter*, dated April 29, 2016 (the "Commitment Letter"). Bank of America N.A. (together with Wells Fargo in its capacity as lender under the DIP Facility, the "DIP Lenders") signed a joinder to the Commitment Lender.

12. I believe that the negotiations preceding the execution of the Commitment Letter were robust. During the months of March and April, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, exchanging multiple drafts of a term sheet that would ultimately be attached to the Commitment Letter, including with respect to the size of the financing needed to implement the restructuring through chapter 11 cases, the associated interest and fees and the composition of the borrowing base under the DIP Facility. During this time, the Debtors also negotiated with Wells Fargo the terms of exit financing that would replace the DIP Facility upon emergence from chapter 11, including the economics of the Exit Facility, the associated fees and the grant of new junior liens (i) to the Term Lenders and Incremental Term Lenders on collateral securing the Pre-Petition Revolving Facility and (ii) to the lenders under the Exit Facility on the collateral securing the Term Loan and Incremental Term Loan. Following the execution of the Commitment Letter, the Debtors and the DIP Agent have, through their legal counsel and directly, engaged in extensive, arm's length negotiations regarding the form and substance of the DIP Credit Agreement and other DIP Loan Documents. I believe that these negotiations have been extensive, at arm's length and in good faith.

13. While negotiating the terms of the proposed DIP Facility with the DIP Lenders, the Debtors also solicited and explored potential DIP financing from third parties. Lazard contacted potential lenders with experience in the oilfield services industry and with providing debtor-in-possession financing, inquiring as to whether they were interested in

exploring a potential transaction, including on a *pari passu* basis with the Debtors' prepetition secured creditors, on a junior secured basis, or on an unsecured, administrative expense basis.

14. No parties provided a term sheet or expressed an interest in providing such financing. Nor did any of the parties Lazard contacted express a willingness to provide DIP financing on terms that were cumulatively more favorable to the Debtors than the DIP Lenders' proposal. Of paramount importance is that no lender contacted was willing to provide unsecured DIP financing or secured post-petition financing that would be junior to the Debtors' prepetition secured debt. Finally, no other potential lender contacted proposed a DIP loan that would convert to exit financing.

### The DIP Facility Should Be Approved

15. Based on my experience and review of comparable DIP financing transactions and the results of the efforts to seek alternative DIP financing, I believe that the financial terms of the DIP Facility are reasonable under the circumstances.

16. In my opinion, the proposed DIP Facility is a vital component in preserving the value of the Debtors' business and, as such, is in the best interests of the Debtors' estates and creditors. Significantly, the DIP Lenders' status as prepetition first lien secured lenders positions them to consent to the subordination of the liens securing the Pre-Petition Revolving Credit Facility, avoiding a dispute over priming. Further, the DIP Lenders' conditional agreement to refinance their DIP Facility claims and lend to the Debtors under the Exit Facility is of critical significance for the Debtors, as it allowed them to enter chapter 11 with greater certainty of having both operational liquidity and the ability to exit chapter 11 on a timely and efficient basis.

17. The Debtors' agreement to pay the reasonable fees and expenses of the DIP Lenders and DIP Agent are market terms, and based on the negotiations I believe that such

agreement was necessary to induce the DIP Lenders to provide the DIP Financing. Based on the state of the Debtors' industry and the current market for financing of distressed energy and oilfield services companies and the other factors described in this Declaration, I believe the terms of the DIP Facility are reasonable and in the best interest of the Debtors and their stakeholders.

[*Signature Page Follows*]

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of its filing under penalty of perjury.

Andrew Yearley
Managing Director
Lazard Frères & Co. LLC